**Date Signed:**
**November 10, 2014**



# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re ZACHARY LATIMER,<br><br>　　　　　Debtor. | Case No. 14-00004<br>Chapter 7 |
| MICHAEL and SUE CLARKE,<br><br>　　　　　Plaintiffs,<br>　vs.<br><br>ZACHARY LATIMER,<br><br>　　　　　Defendant. | Adv. Pro. No. 14-90006<br><br><br><br><br>Re: Docket No. 1 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this adversary proceeding was held on November 3 and 4, 2014. At trial, Neil Verbrugge and Allison Ito represented plaintiffs Michael and Sue Clarke, and Rick Abelmann represented defendant Zachary Latimer.

Based on the evidence, I make the following

### FINDINGS OF FACT

1.　　In 2008, Zachary Latimer was engaged in the business of soliciting

investment funds from third parties and making investments with those funds. He had no relevant education or formal training and virtually no experience in that business. He had no licenses to engage in any securities or investment business. He formed several companies to facilitate his investment business, one of which was Velocity2, LLC.

2. In 2008, Mr. Latimer met Michael and Sue Clarke through a mutual acquaintance. The Clarkes were looking for an investment opportunity. Michael Clarke had spent his career as a chiropractor and Sue Clarke had managed his office. Mr. Clarke retired from his practice in 2006 due to a disability. In 2007, Mr. and Mrs. Clarke sold a piece of real property for a substantial sum. They wanted to invest the proceeds in order to supplement their retirement income, which consisted mostly or entirely of Social Security benefits.

3. Mr. Latimer told Mr. and Mrs. Clarke that he could offer them an investment in "platform banking." In telephone conversations and a face-to-face meeting, he explained that the ultimate recipient of the Clarkes' investment would use the funds to enhance its balance sheet, or as leverage, and would thus be able to borrow much larger amounts of money and make very large returns. He represented that the ultimate recipient would not be able to use the investors' funds, and that those funds would be held for the entire duration of their investment in an escrow account or attorneys' trust account where they would always be safe, intact, and

2

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed 11/12/14   Page 2 of 11

readily available. The Clarkes emphasized to Mr. Latimer that they were investing their retirement nest egg and that the funds had to be absolutely safe. Mr. Latimer reassured the Clarkes that their principal would be safely held in escrow for the entire term of their investment and would always be immediately available, and that the most they might lose was the interest they expected to earn. In reliance on these representations, the Clarkes agreed to invest $500,000.

4. Unbeknownst to the Clarkes, Mr. Latimer planned to invest the Clarkes' money with Madison Capital Management, LLC ("MCM"). On May 14, 2008, Mr. Latimer signed a Master Loan Agreement with MCM. This agreement was inconsistent with Mr. Latimer's representations to the Clarkes. Contrary to his representation that the recipient of the Clarkes' money could not use the funds, the Master Loan Agreement permitted MCM to use the funds "to conduct its business activity." The agreement went so far as to provide that "the Lender shall not be entitled to make inquiries in respect of the use made by the Borrower of the Loan . . . ." The Master Loan Agreement did not require MCM to hold the Clarkes' money in escrow for the entire duration of their investment, contrary to Mr. Latimer's representations to them, and Mr. Latimer had no other assurance that MCM would do so.

5. Mr. Latimer never told the Clarkes about the terms of his loan to MCM and did not give them copies of the documents until after this adversary proceeding

3

began.

6. Also on May 14, 2008, Mr. Latimer, MCM, and Capital Law Group, P.C., entered into an Escrow Agreement, pursuant to which Capital Law Group agreed to hold the funds in escrow pending Mr. Latimer's instructions. This apparently was consistent with Mr. Latimer's representations to the Clarkes. But on the very same day, May 14, 2008, Mr. Latimer signed a Release Notice, instructing Capital Law Group to disburse the funds to MCM.

7. Mr. Latimer never told the Clarkes that he had authorized the release of their funds from escrow and did not give them copies of the Escrow Agreement or the Release Notice until after this adversary proceeding began.

8. On May 15, 2008, the Clarkes wired $500,000 to Velocity2's bank account. The Clarkes did not know, and would not have made the investment if they had known, that Mr. Latimer had already authorized the release of their retirement funds from escrow.

9. In return, Mr. Latimer signed and delivered to the Clarkes, on behalf of Velocity2, a promissory note dated May 16, 2008, in the original principal amount of $500,000. The note bore interest at 60% per annum, payable monthly. The principal was payable in one year.

10. On May 16, 2008, Velocity2 wired the Clarkes' money to Capital Law Group.

4

11.     Mr. Latimer believed that MCM would aggregate the Clarkes' funds with other investors' money and make a further investment with other entities who would engage in the "platform banking" business. Mr. Latimer did not know who would eventually receive the money. He knew that he had no assurance that the ultimate recipient would hold the money in escrow as he had represented to the Clarkes.

12.     The first interest payment to the Clarkes was due on July 20, 2008. When they did not receive that payment, the Clarkes contacted Mr. Latimer. He claimed that the payment was late because it was taking longer than expected to set up the platform banking investment.

13.     Mr. Latimer made the first interest payment of $25,000 to the Clarkes on August 7, 2008. Shortly thereafter, he began to solicit the Clarkes to make another investment. In telephone calls and a face-to-face meeting, he made essentially the same representations that he had made about the first investment: that the funds would be invested in "platform banking"; that their principal would always be completely safe because their funds would be held, for the entire duration of the investment, in an escrow account; that they could get their funds back at any time, on demand; and that the ultimate recipient of the funds could not touch them. The Clarkes reminded Mr. Latimer that the funds were their retirement nest egg and that the investment had to be absolutely safe. Mr. Latimer repeated his representations about the safety of the investment. In reliance on these representations, the Clarkes

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed 11/12/14   Page 5 of 11

agreed to invest another $500,000.

14. On September 3, 2008, the Clarkes wired $500,000 to Velocity2.

15. In return, Mr. Latimer signed and delivered to the Clarkes, on behalf of Velocity2, a promissory note dated September 1, 2008, in the original principal amount of $500,000. The note bore interest at 60% per annum, payable monthly. The principal was payable in one year.

16. Again unbeknownst to the Clarkes, Mr. Latimer planned to invest the Clarkes' second investment with Sovereign Equity Group, Inc. ("SEG"). On September 18, 2008, Mr. Latimer signed (on behalf of Velocity2) a Master Loan Agreement with SEG. But for the change of the borrower's name, the SEG Master Loan Agreement is virtually identical to the MCM Master Loan Agreement.

17. Mr. Latimer never told the Clarkes about the terms of his loan to SEG and did not give them copies of the documents until after this adversary proceeding began.

18. Mr. Latimer also signed (apparently on behalf of himself and Velocity2) an Escrow Agreement, effective as of September 4, 2008, with SEG and The Stallworth Firm, LLC pursuant to which The Stallworth Firm agreed to hold the funds in escrow pending Mr. Latimer's instructions. This apparently was consistent with Mr. Latimer's representations to the Clarkes. But Mr. Latimer signed a Release Notice, effective the same day, September 4, 2008, instructing The Stallworth Firm to

6

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed  11/12/14   Page 6 of 11

disburse the funds to SEG. The Clarkes would not have made the second investment if they had known that Mr. Latimer was going to authorize the release of their retirement funds from escrow.

19. Between September 4 and September 12, 2008, Velocity2 wired the Clarkes' money to The Stallworth Firm.

20. Mr. Latimer believed that SEG would aggregate the Clarkes' funds with other investors' money and make a further investment with other entities who would engage in the "platform banking" business. Mr. Latimer did not know who would eventually receive the money and knew that he had no assurance that the ultimate recipient would hold the money in escrow as he had represented to the Clarkes.

21. Mr. Latimer's representations about the escrow accounts (specifically, that the Clarkes' funds would be held in escrow for the entire duration of the investment where they would always be safe, could not be touched, and could be retrieved on demand) were false, and Mr. Latimer knew they were false. By the time he got the Clarkes' first investment, he had already signed a document releasing the funds from escrow, and he planned to do the same with respect to the second investment. He knew that he had no assurance that any subsequent recipient of the Clarkes' money would hold the money in escrow, keep it safe, not use it, and return it on demand.

22. Mr. Latimer made these misrepresentations with the intent to deceive

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed 11/12/14   Page 7 of 11

the Clarkes. He knew (because the Clarkes repeatedly told him so) that the safety of the investment was crucial to the Clarkes. He knew that they would not make the investment unless he convinced them that it was absolutely safe. He misrepresented the safety of the investment to them because he wanted to induce them to make the investment, from which he hoped to receive profits and other benefits.

23. Mr. Latimer testified that he was simply passing on to the Clarkes information he received from others and which he believed was true. I do not believe this testimony. It is not believable that Mr. Latimer thought the money would remain in escrow even though he agreed in writing to release the money from escrow and even though he had no idea who would ultimately end up with the money.

Based on these findings of fact, I make the following

## CONCLUSIONS OF LAW

1. The bankruptcy court has personal and subject matter jurisdiction. It also has statutory and constitutional authority to enter a final judgment.

2. The Clarkes argue that Mr. Latimer's debt to them is excepted from discharge under sections 523(a)(2)(A) and 523(a)(4).

3. To prevail under section 523(a)(2)(A), the plaintiffs must prove five elements:

> 1. Misrepresentation, fraudulent omission, or the debtor's deceptive conduct;

8

2. Knowledge of the falsity or deceptiveness of his statement or conduct;

3. An intent to deceive;

4. Justifiable reliance by the creditor on the debtor's statement or conduct; and

5. Damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.[1]

4. Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor.[2]

5. The plaintiff seeking to establish an exception to the discharge bears the burden of proof.[3] The plaintiff must meet this burden by a preponderance of the evidence.[4]

6. I have held that a prior judgment entered by the Idaho state court in favor of the Clarkes and against Mr. Latimer establishes the first, fourth, and fifth elements.

---

[1] *Oney v. Weinberg (In re Weinberg),* 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009).

[2] *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992); *see also National Union Fire Insurance Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir. 1996); *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

[3] Fed. R. Bankr. P. 4005; *see also In re Niles*, 106 F.3d 1456, 1464-65 (9th Cir. 1997).

[4] *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000).

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed 11/12/14   Page 9 of 11

7. Based on the evidence at trial, I have found that Mr. Latimer intended to deceive the Clarkes and knew that his representations to the Clarkes were false. This satisfies the second and third elements.

8. Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity . . . ."

9. A debtor has committed defalcation if he intentionally breaches a fiduciary duty or if he "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty."[5] The risk must involve a "*gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'"[6]

10. Federal law defines what constitutes a "fiduciary capacity."[7] The debtor is in a fiduciary capacity when there is an express or technical trust that existed before he incurred the debt.[8]

11. State law determines when there is an express or technical trust.[9] In Idaho, a trust exists if a person (the settlor) 1) intends, 2) to transfer legal title to

---

[5] *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 1759-60 (2013) (quoting Model Penal Code§ 2.02(2)(c) (1985)).

[6] *Id.* at 1760 (quoting Model Penal Code§ 2.02(2)(c) cmt. 9 (1985).

[7] *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996).

[8] *Id.*

[9] *Id.*

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed 11/12/14   Page 10 of 11

property, 3) to another person (the trustee), 4) to enable the trustee to hold the property for a third person's benefit.[10]

12.     I conclude that the defendant did not act in a fiduciary capacity. Neither the Clarkes nor Mr. Latimer intended that Mr. Latimer would hold the Clarkes' money for the Clarkes' benefit. His only intended role was to be a conduit, so that some other third party would hold the money. Therefore, Mr. Latimer could not have been a trustee under Idaho law or section 523(a)(4).

## JUDGMENT

Based on these findings of fact and conclusions of law, Zachary Latimer's debt to Michael and Sue Clarke is not dischargeable in bankruptcy. Counsel for the Clarkes shall submit a proposed judgment.

## END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[10] *Camp Easton Forever, Inc. v. Inland Northwest Council Boy Scouts of America*, 332 P.3d 805, 813 (Idaho 2014).

U.S. Bankruptcy Court - Hawaii   #14-90006   Dkt # 119   Filed 11/12/14   Page 11 of 11